Christin Cho (Cal. Bar No. 238173)
christin@dovel.com
Richard Lyon
rick@dovel.com (Cal Bar No. 229288)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
A. Cyclone Covey, Esq. (CA SBN 335957)
cyclone@kneuppercovey.com
KNEUPPER & COVEY, PC
17011 Beach Blvd., Ste. 900
Huntington Beach, CA 92647-5998
Tel: (512) 420-8407

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

MARK VANVALKENBURGH, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

INTEL CORPORATION,

*Defendant*.

Case No. 5:24-cv-07703

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## Table of Contents

I. Introduction. 1
II. Parties. 1
III. Jurisdiction and Venue. 2
IV. Facts. 2
A. Intel's desktop core processors. 2
B. Intel's 13th and 14th Gen Core desktop processors are defective. 4
C. Intel's ads are misleading to reasonable consumers. 4
D. Plaintiff was misled and harmed. 7
E. No adequate remedy at law. 8
V. Class action allegations. 8
VI. Claims. 11
First Cause of Action: Fraudulent Omission 11
Second Cause of Action: Breach of Implied Warranty 13
Third Cause of Action: Violation of New York General Business Law § 349 14
Fourth Cause of Action: 15
Fifth Cause of Action: Quasi-Contract 17
VII. Relief. 17
VIII. Demand for Jury Trial. 18

## I. Introduction.

1. Intel is a technology company that manufactures and sells computer components, including computer processors.

2. A computer processor is a critical component of a computer. It "acts as the 'brain' of the computer — it reads and interprets commands from software programs and uses them to control other components within the machine."[1]

3. Intel released its 13th and 14th generation desktop processors in 2022 and 2023. Consumers bought the processors, reasonably believing that they would work as intended in computers. But the processors were defective. They were unstable, prone to crashing, and failed at high rates.[2] Intel ultimately revealed that the instability was caused by a defect that allowed elevated operating voltage, which would damage processors and cause instability, failures, and crashes.[3]

4. Plaintiff purchased an Intel Core i7-13700K Desktop Processor affected by the defect. Plaintiff brings this case individually and for other consumers who purchased Intel's 13th and 14th generation desktop processing chips, including products containing the chips.

## II. Parties.

5. Plaintiff Mark Vanvalkenburgh is domiciled in Orchard Park, New York.

6. The proposed class includes citizens of every state.

7. Defendant Intel Corporation is a Delaware Corporation with its principal place of business at 2200 Mission College Blvd., Santa Clara, CA 95054.

---

[1] https://www.lenovo.com/us/en/glossary/what-is-cpu/?

[2] https://www.theverge.com/2024/4/9/24125036/intel-game-crash-13900k-14900k-fortnite-unreal-engine-investigation; https://www.pcgamer.com/hardware/processors/intel-cpu-crashes-what-you-need-to-knowmicrocode-to-blame-but-fix-incoming-this-month-alongside-two-year-extended-warranty/

[3] https://www.pcgamer.com/hardware/processors/intel-cpu-crashes-what-you-need-to-knowmicrocode-to-blame-but-fix-incoming-this-month-alongside-two-year-extended-warranty/; https://www.pcgamer.com/hardware/processors/intel-cpu-crashes-what-you-need-to-knowmicrocode-to-blame-but-fix-incoming-this-month-alongside-two-year-extended-warranty/; https://community.intel.com/t5/Processors/July-2024-Update-on-Instability-Reports-on-Intel-Core-13th-and/m-p/1617113

## III. Jurisdiction and Venue.

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from Defendant.

9. The Court has personal jurisdiction over Defendant because its principal place of business is within this District.

10. Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant resides in this district.

11. Divisional Assignment. This case should be assigned to the San Jose division. See L.R. 3-2(c). A substantial part of the events giving rise to the claims occurred in Santa Clara, California.

## IV. Facts.

### A. Intel's desktop core processors.

12. Computers have become a part of everyday life in the United States. 81% of households own a computer. The processor is one of the most important components of a computer. It is the "brain" of the computer, and solves the sophisticated algorithms that are required to run a program or application.[4] Thus, the processor is critical to the operation of computers.

13. Intel makes and sells processors.

14. In September 2022, Intel released its 13th Gen Core desktop processors. When the 13th generation desktop processors were released, Intel touted the speed and performance of the new processors.[5]

13th Gen Intel Core desktop processors deliver the world's best gaming experience and unmatched overclocking capabilities.

[4] https://www.hp.com/my-en/shop/tech-takes/post/most-important-computer-components#

[5] https://www.intel.com/content/www/us/en/newsroom/news/13th-gen-core-launch.html#gs.h5i4r1

> SAN JOSE, Calif., Sept. 27, 2022 – Today at Intel Innovation, Intel revealed the 13th Gen Intel® Core™ processor family, led by the 13th Gen Intel® Core™ i9-13900K – the world's fastest desktop processor[1]. The new 13th Gen Intel Core family includes six new unlocked desktop processors with up to 24 cores and 32 threads and blazing clock speeds up to 5.8 GHz for the best gaming, streaming and recording experience[2].

15. In October 2023, Intel released its 14th Gen Core desktop processors. Intel again touted the speed and performance of its new processors.[6]

> Intel Launches Intel Core 14th Gen Desktop Processors for Enthusiasts
>
> Latest Intel processors deliver world's fastest desktop frequencies, the world's best desktop experience for enthusiasts and unparalleled overclocking for incredible performance.

> **Why It Matters:** The role of the CPU in gaming and creating has never been more important. Intel Core 14th Gen desktop processors – powered by Intel's advanced performance hybrid architecture – give PC enthusiasts the compute performance they need without compromising user workflow[2].
>
> At the top of the Intel Core 14th Gen desktop processor stack, the i9-14900K – the world's fastest desktop processor with 6 GHz speeds right out of the box – gives gamers the edge they need to stay on top[3]. And with 25% more cores in the i7-14700K, creators will enjoy significant performance gains in their multi-threaded workloads. Combined with the world's best overclocking experience and compatibility with existing 600/700-series motherboards, Intel Core 14th Gen desktop processors deliver the computing power and performance enthusiasts require[4].

[6] https://www.intel.com/content/www/us/en/newsroom/news/intel-core-14th-gen-desktop-processors.html#gs.h5i701

16. And, millions of consumers purchased 13th and 14th Gen Core desktop processors (the "Products"), believing that the desktop processors would perform as advertised.

**B. Intel's 13th and 14th Gen Core desktop processors are defective.**

17. In December 2022, just months after the 13th Gen Core desktop processor was first released, users began complaining that the processor was crashing and failing at high rates. The reports of the problem "grew to a crescendo by the end of 2023."[7]

18. Throughout 2023 and 2024, multiple users and tech websites reported that Intel's 13th and 14th Gen Core desktop processors were defective, unstable, and crashing at high rates.[8] The processors were returned at unusually high rates by users.[9]

19. By late 2022 or early 2023, Intel knew of the defect. Intel's Products undergo pre-release and post-release testing. Through these tests, Intel became aware of the defect in the processors. In addition, Intel monitors return rates, press reports, and user reports of defects. By late 2022 and early 2023, there were numerous reports that the Intel chips were failing at high rates. Thus, Intel knew that its Products were defective by late 2022 or early 2023.

**C. Intel's ads are misleading to reasonable consumers.**

20. Despite the defects, Intel's marketing materials, ads, and packaging touted the speed and performance for its Products, and did not mention the defect.

21. On its website, Defendant claims that the Products offer "more power, performance, and efficiency for every computing need":[10]

---

[7] https://wccftech.com/intel-14th-13th-gen-cpu-instability-issues-solved-confirms-0x12b-as-final-mitigation/ ("The first instances of…issues on the 13th Gen Core i9 CPUs were reported back in 2022"); https://www.reddit.com/r/FortNiteBR/comments/zgl1y2/out_of_video_memory_error_on_high_end_system/; https://www.tomshardware.com/pc-components/intel-raptor-lake-instability-troubles-everything-you-need-to-know

[8] https://www.techspot.com/news/104010-intel-crashing-cpu-crisis-deepens-more-models-affected.html; https://alderongames.com/intel-crashes; https://www.theverge.com/24216305/intel-13th-14th-gen-raptor-lake-cpu-crash-news-updates-patches-fixes-motherboards; https://www.pcmag.com/explainers/intels-raptor-lake-desktop-cpu-bug-what-to-know-what-to-do-now; https://www.tomshardware.com/pc-components/intel-raptor-lake-instability-troubles-everything-you-need-to-know

[9] https://en.overclocking.com/core-i-13-and-14-have-a-high-after-sales-return-rate/

[10] https://www.intel.com/content/www/us/en/products/details/processors/core.html



Intel® Core™ Processor Family

Welcome to a new level of creating, gaming, and productivity—with more power, performance, and efficiency for every computing need.

Mobile product brief: Intel® Core™ processors ›

Mobile product brief: Intel® Core™ processors (14th gen) ›

intel. CORE

Welcome to a new level of creating, gaming, and productivity—with more power, performance, and efficiency for every computing need.

| | |
|---|---|
| Intel® Core™ i9 Processors | Delivering up to 24 cores for seamless 4K Ultra HD and 360-degree video, robust gameplay, and multitasking performance. |
| Intel® Core™ i7 Processors | This CPU packs the power of up to 20 cores for accelerated computing supporting high-end gaming, connectivity, and security. |
| Intel® Core™ i5 Processors | Experience exceptional performance for home and business PCs with up to 14 cores for gaming, creativity, and multitasking. |
| Intel® Core™ i3 Processors | These value-packed processors deliver outstanding performance for everyday tasks. |
| Intel® Core™ Processors | For casual gaming, multitasking, and reliable connectivity, this processor family provides solid, real-world-performance laptop users can rely on. |

22. Intel also advertises the 13th generation and 14th generation as offering "seamless 4k Ultra HD and 360-degree video, robust gameplay, and multitasking performance" and "accelerated computing supporting high-end gaming, connectivity, and security."

23. Likewise, the online listings for Intel's Products on the websites of authorized retailers include substantially the same representations about the speed and performance of the processors, and do not warn consumers of defects.

24. For example, here is a representative Best Buy listing for Intel "Core i7-13700K 13th Gen" Processor:[11]

[11] https://www.bestbuy.com/site/intel-core-i7-13700k-13th-gen-16-cores-8-p-cores-8-e-cores-30m-cache-3-4-to-5-4-ghz-lga1700-unlocked-desktop-processor-grey-black-gold/6521194.p?skuId=6521194

25. As shown above, the Product page touts that Intel's 14th Generation processor offers "efficient use" with "high processing throughput and improved performance." It further claims that the Product is "optimized for gamers and productivity" and "deliver[s] high performances."

26. But the design and/or manufacture of Intel's 13th Generation and 14th Generation processors make the Product defective and cause symptoms such as instability, failures, and crashes.

27. Reasonable consumers bought the Products, reasonably believing that the Products were not defective and that they would run stably when used as directed.

28. If Intel wanted to be truthful, it would have clearly and prominently warned consumers that the chips are defective, and subject to instability problems and unusually high crash and failure rates. Intel's packaging, however, did not disclose any of these problems, and thus made material misstatements and omissions.

29. The omissions were material, because a reasonable consumer attaches importance to the stability of a computer processor. Consumers are willing to pay more for a reliable processor that runs stably, without failing or crashing frequently. They do not want to pay for a processor that is unreliable or unstable.

30. Intel's material omissions increased the demand for its Products. As a result, Intel was able to charge more for its Products than it would have been had its packaging and ads had

truthfully disclosed the defect. Accordingly, as a direct result of Intel's false statements and material omissions, Intel was able to charge a price premium for its Products. As purchasers of Products, Plaintiff and each member of the proposed class paid this price premium and, as a result, sustained an economic injury as a result of Intel's false statements and material omissions.

31. Due to the press reports, online complaints, its own testing, and return rates, Intel knew the truth about its defect in late 2022 or early 2023. Thus, Intel knew that the statements on its packaging and ads were false and misleading to reasonable consumers. Intel intended that consumers rely on these false and misleading statements when purchasing the Products.

32. Intel's representations and omissions led reasonable consumers to believe that they were purchasing Products that were free from defects. Reasonable consumers do not expect that the Products will crash and fail at high rates, or that running the Products will damage the Products themselves.

**D.    Plaintiff was misled and harmed.**

33. In January 2023, Plaintiff purchased a Intel Core i7-13700k Desktop Processor online from BestBuy.com while living in New York. He paid about $411.21 for the processor.

34. Before purchasing the product, Plaintiff saw Intel's marketing materials touting the processor's performance and speed, and relied on Intel's representations on the Best Buy website listing for Intel's Core i7-13700k Desktop Processor at the time. After purchasing the product but before using it, Plaintiff viewed the processor's packaging that had information about the product, and relied on the packaging.

35. After purchasing the product, Plaintiff learned that the processor was defective, unstable, and crashing at high rates. The processor caused issues in his computer, including random screen blackouts and random computer restarts. These issues were not resolved even after he attempted to install a patch issued by Intel for its 13th Generation processors. As a result, he did not get what he paid for. Had Plaintiff known the truth about the product, he would not have bought the product, or would have paid less for it.

36. Plaintiff would purchase Intel Products again if they were actually sold as advertised. Plaintiff, however, faces an imminent threat of harm because Plaintiff will not be able to rely on

Intel's ads in the future, and thus will not be able to purchase the products even if they were sold as advertised.

**E. No adequate remedy at law.**

37. Plaintiff seeks damages and, in the alternative, restitution. Plaintiff is permitted to seek equitable remedies in the alternative because he has no adequate remedy at law.

38. A legal remedy is not adequate if it is not as certain as an equitable remedy. The elements of Plaintiff's equitable claims are different and do not require the same showings as Plaintiff's legal claims. For example, to obtain damages as a result of the breach of an express warranty, Plaintiff must show that they complied with the notice requirement for express warranty claims. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, rather than restitution, the legal remedies are more uncertain.

39. In addition, the remedies at law available to Plaintiff are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay. And a jury trial will take longer, and be more expensive, than a bench trial.

**V. Class action allegations.**

40. Plaintiff brings the asserted claims on behalf of the proposed classes:

- Nationwide Class: all individuals who purchased the 13th or 14th Gen Core Desktop processors in the United States, within the governing statute of limitations period.
- New York Subclass: all individuals who, while in the state of New York, purchased the 13th or 14th Gen Core Desktop processors, within the governing statute of limitations period.

41. It is appropriate to include all such individuals in the same class. All such individuals were presented with substantially similar misrepresentations and omissions by Intel. All proposed class members allege the same violations of law and seek the same relief. There are no conflicts of interest among the proposed class members.

42. For certain claims, Plaintiff brings those claims on behalf of a subclass of those consumers who, like Plaintiff, live in New York (the "New York Subclass").

43. The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

***Numerosity***

44. The proposed Class contains members so numerous that separate joinder of each member of the class is impractical. Based on Intel's sales, there are hundreds of thousands or millions of proposed class members.

***Commonality***

45. There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation:

(1) whether Intel's Products are defective;

(2) whether Intel knew of the defect but continued to promote and sell the Products, without disclosing the defect or its consequences to consumers;

(3) whether a reasonable consumer would consider the defect and its consequences important in the decision of whether to purchase the Product;

(4) whether Intel breached its warranties;

(5) damages needed to compensate Plaintiff and the proposed class.

***Typicality***

46. Plaintiff's claims are typical of the proposed class. Like the proposed class, Plaintiff purchased one of Intel's defective Products. Plaintiff alleges the same violations of law and seeks the same relief as the proposed class.

***Adequacy***

47. Plaintiff will fairly and adequately protect the interests of the proposed class. Plaintiff's interests are aligned with the interests of the proposed class members: Plaintiff seeks damages and other relief for Intel's alleged wrongs. Plaintiff is represented by experienced class action counsel who are prepared to vigorously litigate this case through judgment and appeal. There are no conflicts of interest between Plaintiff and the class.

48. Final injunctive relief is appropriate respecting the class as a whole.

49. Intel has sold defective processors in ways that apply generally to the class. Accordingly, final injunctive relief prohibiting Intel from engaging in such conduct would appropriately apply class-wide.

***Predominance and Superiority***

50. The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that the same Intel ad is deceptive with respect to some proposed class members, but not others.

51. Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member. Each class member's claims arise out of the same conduct by Defendant. And a core liability question is common: whether Intel's Products are defective.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of hundreds of thousands (or millions) of similar, individual claims in separate lawsuits.

***Ascertainability***

53. Class membership can be objectively determined based on whether they bought the Intel Products. The number and identity of class members can be determined through Intel's records, the records of its retailers, and appropriate methods of public notice.

**VI. Claims.**

**First Cause of Action:**

**Fraudulent Omission**

**(By Plaintiff and the Nationwide Class)**

54. Plaintiff incorporates the above allegations by reference.

55. Plaintiff brings this claim on behalf of the Nationwide Class.

56. As alleged in further detail above, Intel intentionally suppressed and concealed material facts about the performance and quality of the Product.

57. Intel knew that the Products were defective, that there were numerous consumer complaints and press articles about the defect, and that the Products were being returned at a higher than normal rate.

58. Because the defect in the Products is latent and unobservable until it arises, Plaintiff and class members had no reasonable means of knowing that Intel's representations concerning the Product were incomplete, false, or misleading, or that it had failed to disclose that the Product is defective. Plaintiff and class members did not and reasonably could not have discovered Intel's deceit before they purchased the Product.

59. Had Plaintiff and class members known that the Product is defective, they would not have purchased a Product, or paid less for it.

60. Intel had a duty to disclose the defect because the defect is material and Intel possessed exclusive knowledge of it. Intel conducted pre- and post-release testing of the Products, and is aware of the performance of the Products. Only Intel had access to those test results. Intel also monitors return rates, and reports of defects. Intel has exclusive knowledge of that information.

61. Intel also had a duty to disclose the defect because, through advertising, press releases, and statements made during the launch event, on its Product webpages, in its online purchase portal,

and in other sources that Plaintiff and class members encountered before purchasing their processors, Intel made partial representations regarding the supposed high quality of the Product and its features, but failed to disclose the defect that would have materially qualified these partial representations. Having volunteered information relating to the Products to Plaintiff and class members, Intel had a duty to disclose the whole truth about the Products and, in particular, the defective nature of the Products.

62. Plaintiff was exposed to Intel's specific representations about the Product before and immediately after purchase.

63. Plaintiff saw Intel's representations about the Product online or in product advertisements, and received further information from Intel about the Product during its setup.

64. Plaintiff saw the external packaging of the Product—which Intel developed. None of the information sources that Plaintiff encountered indicated that the Products were defective.

65. Intel concealed the defect to sell more Products at a premium price and avoid damage to its brand.

66. The facts about the Products that Intel suppressed and omitted were material, and Plaintiff and class members were unaware of them until after they purchased the Products. Had Intel disclosed the defect, including through advertising, press releases, the Product packaging, or the initial setup process, Plaintiff and class members would not have purchased a Product, or would have paid substantially less for it.

67. When deciding to purchase a Product, Plaintiff and class members reasonably relied to their detriment upon Intel's material misrepresentations and omissions regarding the quality of the Products and the absence of a product defect.

68. Plaintiff and class members sustained damages as a direct and proximate result of Intel's deceit and fraudulent concealment. Among other damage, Plaintiff and class members did not receive the value of the premium price they paid for the Product.

69. Intel's fraudulent concealment was malicious, oppressive, deliberate, intended to defraud Plaintiff and class members and enrich Intel, and recklessly disregarded Plaintiff's and class

members' rights, interests, and collective well-being. Intel's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof.

**Second Cause of Action:**

**Breach of Implied Warranty**

**(by Plaintiff and the Nationwide Class)**

70. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

71. Plaintiff brings this count individually and for the Nationwide Class.

72. The Uniform Commercial Code § 2-314 states that "a warranty that [] goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." "Merchantable" goods must be "fit for the ordinary purposes for which the goods are used."

73. Defendant is and was, at all relevant times, a merchant with respect to computer components, and with respect to the Products in particular. Defendant's Products each constitutes a "good" under the UCC.

74. Plaintiff and class members purchased Defendant's Products.

75. As the manufacturer of computer components, Defendant impliedly warranted to Plaintiff and the class that the products were of merchantable quality and were safe for their ordinary use in computers. In fact, as described in detail above, the products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used. Specifically, the Products are inherently flawed given a defect in design, making them unstable and prone to high failure rates and crashes. The defect processor makes the computers intermittently inoperable, and the processors degrade. The defective design makes them unfit for ordinary purposes even when used correctly.

76. Thus, Defendant breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

77. Plaintiff and the class were foreseeable third-party beneficiaries of Defendant's sale of the Products. Defendant sells the Products to retailers for distribution and sale to consumers such as Plaintiff and class members.

78. Plaintiff provided Defendant with notice of this breach of warranty, by mailing a notice letter to Defendant's headquarters and registered agent on October 23, 2024.

79. Defendant's breach directly caused Plaintiff and class members harm. Plaintiff and class members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth; (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions; or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

**Third Cause of Action:**

**Violation of New York General Business Law § 349**

**(by Plaintiff and the New York Subclass)**

80. Plaintiff incorporates the above allegations by reference.

81. Plaintiff asserts this claim on behalf of himself and the New York Subclass.

82. Plaintiff and the New York Subclass members are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. GEN. BUS. LAW § 349(h).

83. Intel is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. GEN. BUS. LAW § 349(b).

84. Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business,trade or commerce" are unlawful.

85. In the course of Intel's business, it failed to disclose and actively concealed the defect in its Products with the intent that consumers rely on that concealment in deciding whether to purchase the Product.

86. By intentionally concealing the defect while advertising the Products, Intel engaged in deceptive acts or practices in violation of GBL section 349.

87. As described in greater detail above, Intel's deceptive acts or practices were materially misleading. Intel's conduct was likely to and did deceive reasonable consumers, including Plaintiff, about the true performance and value of the Products.

88. Plaintiff and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Intel suppressed.

89. Intel's actions set forth above occurred in the conduct of trade or commerce.

90. Intel's misleading conduct concerns widely purchased consumer products and affects the public interest. Intel's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

91. Plaintiff and New York Subclass members suffered ascertainable loss as a direct and proximate result of Intel's GBL violations. Plaintiff and New York Subclass members overpaid for their Product, and their Products suffered a diminution in value. These injuries are the direct and natural consequence of Intel's material misrepresentations and omissions.

92. Plaintiff, individually and on behalf of the New York Subclass, requests that this Court enter such orders or judgments as may be necessary to enjoin Intel from continuing its unfair and deceptive practices. Under the GBL, Plaintiff and New York Subclass members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Intel acted willfully or knowingly, Plaintiff and New York Subclass members are entitled to recover three times their actual damages. Plaintiff also is entitled to reasonable attorneys' fees.

**Fourth Cause of Action:**

**Violation of New York Gen. Bus. Law § 350**

**(by Plaintiff and the New York Subclass)**

93. Plaintiff incorporates each and every factual allegation set forth above.

94. Plaintiff brings this cause of action on behalf of himself and members of the New York Subclass, seeking statutory damages available under New York Gen. Bus. Law § 350 (among other relief).

95. Defendant's advertising of its Products, and failure to disclose the defect in its Products, was consumer-oriented.

96. Defendant's omissions have a broad impact on consumers at large, i.e., tens or hundreds of thousands of New Yorkers or more purchase these products.

97. Defendant's omissions were deceptive and misleading in a material way. As alleged in detail above, these omissions were important to consumers and affected their choice to purchase the Products. And these misrepresentations were likely to mislead reasonable consumers.

98. As described in greater detail above, Intel's deceptive acts or practices were materially misleading. Intel's conduct was likely to and did deceive reasonable consumers, including Plaintiff, about the true performance and value of the Products.

99. Plaintiff and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Intel suppressed.

100. Plaintff and the Subclass relied on Defendant's advertising and omissions.

101. As described in greater detail above, Defendant's omissions were willful and knowing.

102. Plaintiff and New York Subclass members suffered ascertainable loss as a direct and proximate result of Intel's GBL violations. Plaintiff and New York Subclass members overpaid for their Products, and their Products suffered a diminution in value. These injuries are the direct and natural consequence of Intel's material misrepresentations and omissions.

103. Plaintiff, individually and on behalf of the New York Subclass, requests that this Court enter such orders or judgments as may be necessary to enjoin Intel from continuing its unfair and deceptive practices. Under the GBL, Plaintiff and New York Subclass members are entitled to recover their actual damages or $500, whichever is greater. Additionally, because Intel acted willfully or knowingly, Plaintiff and New York Subclass members are entitled to recover three times their actual damages. Plaintiff also is entitled to reasonable attorneys' fees.

**<u>Fifth Cause of Action</u>:**

**Quasi-Contract**

**(by Plaintiff and the Nationwide Class)**

104. Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

105. Plaintiff brings this count individually and for the Nationwide Class. In the alternative, Plaintiff brings this cause of action on behalf of himself and the New York Subclass.

106. Plaintiff and class members conferred a tangible and material economic benefit upon Defendant by purchasing the Products.

107. In exchange for the purchase price, Defendant provided a defective product. Defendant knew and appreciated the benefit they incurred from consumers purchasing Products.

108. Thus, Defendant is aware of, and has retained, the unjust benefit conferred upon them by Plaintiff and the class members.

109. Defendant received a direct and unjust benefit, at Plaintiff's and the class's expense.

110. Plaintiff and the class seek restitution.

**VII. Relief.**

111. Plaintiff seeks the following relief for himself and the proposed class:

- An order certifying the asserted claims, or issues raised, as a class action;
- An order appointing Plaintiff as representative for the Nationwide Class and each Subclass, and appointing their counsel as lead counsel for the classes;
- A judgment in favor of Plaintiff and the proposed classes;
- Damages, treble damages, statutory damages, and punitive damages where applicable;
- Restitution;
- Disgorgement, and other just relief;
- An order awarding Plaintiff and all other class members damages in an amount to be determined at trial for the wrongful acts of Defendant;
- Pre- and post-judgment interest on all amounts awarded;

- Injunctive relief as pleaded or as the Court may deem proper;
- Reasonable attorneys' fees and costs, as allowed by law;
- Punitive damages; and
- Any additional relief that the Court deems reasonable and just.

**VIII. Demand for Jury Trial.**

112. Plaintiff demands the right to a jury trial on all claims so triable.

Dated: November 5, 2024

Respectfully submitted,

By: /s/ *Christin Cho*

Christin Cho (Cal. Bar No. 238173)
christin@dovel.com
Richard Lyon
rick@dovel.com (Cal Bar No. 229288)
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
A. Cyclone Covey, Esq. (CA SBN 335957)
cyclone@kneuppercovey.com
KNEUPPER & COVEY, PC
17011 Beach Blvd., Ste. 900
Huntington Beach, CA 92647-5998
Tel: (512) 420-8407

*Attorneys for Plaintiff*